**TEXAS WEST OAKS HOSPITAL, LP and Texas Hospital Holdings, LLC, Petitioners,**

v.

**Frederick WILLIAMS, Respondent.**

No. 10–0603.

Supreme Court of Texas.

Argued Nov. 8, 2011.

Decided June 29, 2012.

174

Ryan Lee Clement, Wesson H. Tribble, Tribble, Ross & Wagner, Houston, TX, for Texas West Oaks Hospital, LP.

Charles M. Hessel, Marks Balette & Giessel, P.C., Robert Steven Kwok, William Wade Hoke, Robert Kwok & Associates, Leah Rush Easterby, Houston, TX, for Frederick Williams.

Justice WAINWRIGHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice GREEN, Justice JOHNSON, and Justice GUZMAN joined.

At issue in this interlocutory appeal is whether the claims of an employee against his employer, both of whom are health care providers, alleging injuries arising out of inadequate training, supervision, risk-mitigation, and safety in a mental health facility, constitute health care liability claims (HCLCs) under the Texas Medical Liability Act (TMLA or Act). *See* TEX. CIV. PRAC. & REM.CODE ch. 74 *et seq.* We conclude that the TMLA does not require that the claimant be a patient of the health care provider for his claims to fall under the Act, so long as the Act's other requirements are met. We hold that the employee here is properly characterized as a "claimant" under the Act and his allegations against his nonsubscribing employer are health care and safety claims under the TMLA's definition of HCLCs, requiring an expert report to maintain his lawsuit. We further hold that the Act does not conflict with the Texas Workers' Compensation Act (TWCA). We therefore reverse the judgment of the court of appeals.

## I. Background

Texas West Oaks Hospital, LP and Texas Hospital Holdings, LLC operate Texas West Oaks Hospital (West Oaks), a state-licensed, private mental health hospital located in Houston, Texas. Freder-

ick Williams, a psychiatric technician and professional caregiver at West Oaks, was injured on the job while supervising a patient, Mario Vidaurre. Vidaurre was admitted to West Oaks on June 11, 2007. Due to his history of paranoid schizophrenia, including manic outbursts and violent behavior directed at family members and professional staff, Vidaurre was placed by his admitting physician on one-to-one observation, an elevated level of supervised care in the psychiatric unit. Vidaurre was also put on "unit restriction," meaning he could only be taken out of the psychiatric unit by direct order of a physician. A few days after Vidaurre's admission, while Williams was supervising him, Vidaurre became agitated. To calm him, Williams took Vidaurre to an outdoor enclosed smoking area, in violation of the unit-restriction policy. The door to the enclosure locked behind them and the unsupervised area contained no cameras, audio supervision, mirrors, or other monitoring apparatus. Although Williams previously had taken Vidaurre to the smoking area without incident, a physical altercation occurred on this occasion, resulting in Vidaurre's death and injuries to Williams.

Vidaurre's estate sued West Oaks, and later Williams, asserting HCLCs under the TMLA, codified in Chapter 74 of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE §§ 74.001–74.507. Williams later asserted cross claims of negligence against West Oaks pursuant to section 406.033 of the Texas Labor Code, a statutory provision governing employee common law claims against employers not subscribed to workers' compensation. *See* TEX. LAB.CODE § 406.033. West Oaks' status as a nonsubscriber to workers' compensation is uncontroverted, and therefore, Williams' claims against his employer are not barred by the Texas Workers' Compensation Act. *See id.; Port Elevator–Brownsville, L.L.C. v. Casados,* 358 S.W.3d 238, 241 (Tex.2012) (discussing the "exclusive remedy" doctrine).

Williams alleged that West Oaks was negligent in:

(a) Failing to properly train Williams to work at West Oaks' premises, including warning him of the inherent dangers of working with patients with the conditions and tendencies that Mario Vidaurre possessed; (b) Failing to adequately supervise West Oaks' employees, including Williams, while working with patients with conditions and tendencies that Mario Vidaurre possessed; (c) Failing to provide adequate protocol to avoid and/or decrease the severity of altercations between its employees, such as Williams, and patients; (d) Failing to provide its employees, including Williams, with adequate emergency notification devices to alert other employees of altercations in which assistance is needed; (e) Failing to warn Williams of the dangers that West Oaks knew or should have known were associated with working with patients such as Mr. Vidaurre; and (f) Failing to provide a safe workplace for its employees, including Williams.

West Oaks filed a motion to dismiss on the grounds that Williams' claims constituted HCLCs under the TMLA and that Williams had not served an expert report on West Oaks, as required under the Act. *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) (defining health care liability claims), and § 74.351(a), (b) (requiring a trial court to dismiss a health care liability claim if an expert report is not served within 120 days of filing suit).[1] Williams

---

1. The HCLC definition was amended after Williams' cause of action accrued, and the prior law is applicable to his claims. Act of June 2, 2003, 78th Leg., R.S., ch. 204,

responded that his claims sound in ordinary negligence rather than health care liability. Following a hearing, the trial court denied West Oaks' motion. West Oaks then filed this interlocutory appeal. *See id.* § 51.014(a)(9).

The court of appeals affirmed the trial court's order. 322 S.W.3d 349, 354. The court analyzed Williams' claims as breaches of West Oaks' duty of safety to its employee. *Id.* at 352. The court of appeals began its analysis from the premise that the phrase "directly related to health care" in section 74.001(a)(13) modifies not only "professional or administrative services," but also the term "safety." *Id.* It concluded that a safety claim "must be directly related to and inseparable from health care." *Id.* It is not disputed here that Vidaurre's claims against West Oaks are HCLCs, but Williams argues his claims against West Oaks are not. The court of appeals noted the related nature of the two parties' cases but concluded, based in part on our withdrawn opinion in *Marks v. St. Luke's Episcopal Hospital*, 52 Tex.Sup.Ct.J. 1184, *withdrawn and superseded on rehearing*, 319 S.W.3d 658 (Tex. 2010), that Williams' claims against West Oaks are separable from health care and are not HCLCs. 322 S.W.3d at 353. Reasoning that the source of West Oaks' duty to Williams is the employer-employee relationship and that the nature of Vidaurre's relationship with West Oaks—patient to health care provider—is different from Williams', the court of appeals concluded that the safety claims "flow from the employment relationship" between Williams and West Oaks and are not "directly related" to health care, as required by the statute. 322 S.W.3d at 352–53; TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). West

Oaks filed a petition for review in this Court.

## II. Discussion

 In seeking to distinguish ordinary negligence claims from HCLCs, the heart of these cases lies in the nature of the acts or omissions causing claimants' injuries and whether the events are within the ambit of the legislated scope of the TMLA. Causes of action that are HCLCs cannot be transmuted to avoid the strictures of the medical liability statute. *Omaha Healthcare Ctr., LLC v. Johnson*, 344 S.W.3d 392, 394 (Tex.2011); *Diversicare Gen. Ptr., Inc. v. Rubio*, 185 S.W.3d 842, 851 (Tex.2005). We recognize that the Legislature intended the Texas Medical Liability Insurance Improvement Act (TMLIIA), the TMLA's predecessor, to be broad, and it broadened that scope further in 2003 with its repeal and amendments resulting in the TMLA. Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(6), 1977 Tex. Gen. Laws 2039, 2040 (former TEX.REV.CIV. STAT. art. 4590i, § 1.02(6)), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. After the 2003 amendments, the breadth of HCLCs include causes of action against physicians and health care providers for negligence in the provision of "medical care, or health care, or safety or professional or administrative services directly related to health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

West Oaks argues that Williams' claims, mirroring the same facts as Vidaurre's HCLCs, are HCLCs and therefore implicate the requirement to serve an expert report. Such a conclusion would mandate

§ 10.09, 2003 Tex. Gen. Laws 847, *amended by* Act of July 19, 2011, 82nd Leg., 1st C.S., ch. 7, § 4.02, 2011 Tex. Gen. Laws 5445 (amending section 74.001(a), adding subsec-

tion (a)(12)(A)(viii) (including a health care collaborative as a "health care provider") and making nonsubstantive changes).

a dismissal because Williams did not serve a report on West Oaks. Tex. Civ. Prac. & Rem.Code § 74.351(a), (b). West Oaks also urges that Williams' status as a health care provider at the hospital—as opposed to a patient—does not remove Williams from the requirement that he pursue his allegations as HCLCs. On the other hand, Williams characterizes his allegations as ordinary negligence claims against a non-subscriber to the workers' compensation scheme. Williams contends that the court of appeals was correct in concluding that his claims fall outside the HCLC definition and therefore an expert report is not required for his suit to proceed. *See* 322 S.W.3d 349, 353–54. Williams also echoes the court of appeals in asserting that West Oaks' alleged safety and security breaches do not require expert medical testimony and are interchangeable with safety and security issues arising in non-medical settings such as corrections facilities. *See id.* at 353 (opining that Williams' safety and security claims involve issues also "aris[ing] in other settings, such as jails and prisons"). In essence, Williams argues that the hospital is the mere situs of his claims, that his role as psychiatric technician overseeing a mental patient has no bearing on the character of his claims, and the fact that his claims arose in a mental health facility has little or no bearing on their character.

## A. Standard of Review

West Oaks' and Williams' arguments both implicate the scope of claims reached by the TMLA. The nature of the claims the Legislature intended to include under the TMLA's umbrella is a matter of statutory construction, a legal question we review de novo. *Marks*, 319 S.W.3d at 663 (interpreting the TMLIIA); *see also MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 500 (Tex.2010) (observing that questions of statutory construction are generally reviewed de novo). In construing a statute, our aim " 'is to determine and give effect to the Legislature's intent,' " and we begin with the " 'plain and common meaning of the statute's words.' " *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex.2003) (quoting *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex.2002); *State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex.2002) (further citations omitted)).

## B. Relationship Between the Parties Under the Act

Williams argues that the lack of a patient-physician or patient-health-care-provider relationship between him and West Oaks is a clear barrier to inclusion of his claims within the Legislature's definition of HCLCs. He asserts that such a relationship is necessary to HCLCs. At one point in the past, Williams may have had a good argument. However, modifications over time to the TMLA and its predecessor indicate a different scope for HCLCs under current law.

The TMLIIA was enacted in 1977 to relieve a medical "crisis [having] a material adverse effect on the delivery of medical and health care in Texas." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(6), 1977 Tex. Gen. Laws 2039, 2040 (repealed 2003). In 2003, facing another "medical malpractice insurance crisis" and a corresponding "inordinate[ ]" increase in the frequency of HCLCs filed since 1995, the Legislature repealed the TMLIIA, amending parts of the previous article 4590i and recodifying it as Chapter 74 of the Texas Civil Practice and Remedies Code. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(a), 2003 Tex. Gen. Laws 847, 884.

The 2003 legislation featured a significant modification to the existing law; it changed the HCLC definition:

'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death *of a claimant,* whether the *claimant's claim or cause of action* sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13)(emphases added). The Legislature replaced the term "patient" with "claimant" in the definition of an HCLC.[2] *Compare* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13), *with* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003). The Legislature also defined the new term in the Act:

'Claimant' means a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim. All persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant.

TEX. CIV. PRAC. & REM.CODE § 74.001(a)(2). "Person" is not defined in the TMLA and therefore must be given its common law meaning. *Id.* § 74.001(b). Changing the term "patient" to "claimant" and defining "claimant" as a "person" expands the breadth of HCLCs beyond the patient population. This in turn necessarily widened the reach of the expert report requirement, unless otherwise limited by other statutory provisions.

However, "health care" and "medical care" HCLCs are separately defined in the Act and reference treatment furnished "for, to, or on behalf of a patient." *Id.* § 74.001(a)(10), (a)(19).[3] As discussed more fully below, "medical care" and "health care" HCLCs require that the claimant be a patient. *See* Part II.D.1, *infra.*

■ With the exception of medical care and health care claims, our focus in determining whether claims come under the TMLA is not the status of the claimant, but the gravamen of the claim or claims against the health care provider. *See Diversicare,* 185 S.W.3d at 854.

## C. Williams' Status as a "Claimant" Under the Act

■ We next examine whether Williams is a "claimant" under the TMLA. Only claimants are obligated to serve expert reports on physicians or health care providers. TEX. CIV. PRAC. & REM.CODE § 74.351(a), (b). West Oaks argues that the language and structure of the definition of "claimant" in the current statute, especially when compared to its predecessor, indicate that the term includes not only patients, but other persons as well. Williams asserts that he is not a "claimant" because his claims are not HCLCs, as they do not involve the exercise of professional medical judgment. Williams also argues that the Legislature's substitution of "patient" with "claimant" is meant only to include derivative claims by the relatives and representatives of deceased pa-

---

2. The Legislature also broadened the subject-matter scope of the activities constituting HCLCs through the addition to the definition of "professional or administrative services directly related to health care." *Id.* § 74.001(a)(24).

3. This conclusion is in harmony with the Legislature's stated intent to "reduce [the] excessive frequency ... of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical malpractice systems...." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(b)(1), 2003 Tex. Gen. Laws 847, 884.

tients, not employees of health care provider defendants.

As observed above, a "claimant" is broadly defined as a "person," including the estate of a person, bringing an HCLC. Tex. Civ. Prac. & Rem.Code § 74.001(a)(2). A claimant is a person seeking damages for an HCLC. See id. § 74.001(a)(2), (13). As noted above, the TMLIIA, by contrast, featured an HCLC definition predicated on injury to a "patient." Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4) (repealed 2003). Neither "person" nor "patient" is a defined term in the TMLA and therefore possesses such meaning as is consistent with the common law. Tex. Civ. Prac. & Rem.Code § 74.001(b).

Although he likely would not have been a "patient" under the TMLIIA, Williams is a "claimant" and a "person" under the textual change to the definition of HCLCs in the TMLA. Not only is the term "patient" not included within the definition of "claimant," the Legislature used the term "including" to precede the reference to a decedent's estate. This renders any components of the definition nonexclusive. Tex. Gov't Code § 311.005(13); Entergy Gulf States, Inc. v. Summers, 282 S.W.3d 433, 440–41 (Tex.2009) (noting that the term "including" is a term of enlargement and cautioning against "circumventing Legislative intent" by misapplying non-exhaustive lists in statutes); see also In re Allcat Claims Serv., L.P., 356 S.W.3d 455, 468 (Tex.2011) (observing that the term "including" in that case was an explanatory term of enlargement).

The dissent argues that the 2003 amendment substituting "claimant" in lieu of "patient" in the HCLC definition merely clarifies that a patient's estate or others acting in a representative capacity may bring an HCLC. 371 S.W.3d at 194 (Lehrmann, J.,

dissenting). But further belying the contention that a "claimant" may be only a patient or her estate is the Act's definition of "representative." The term "representative," used in the Act's medical-records-disclosure provision, is defined as the "agent of the patient or claimant," indicating that patient and claimant do not necessarily refer to the same category of persons. Tex. Civ. Prac. & Rem.Code § 74.001(a)(25) (emphasis added), 74.052; Wilson N. Jones Mem'l Hosp. v. Ammons, 266 S.W.3d 51, 61–62 (Tex.App.—Dallas 2008, pet. denied) (also drawing the distinction). Neither the language of the TMLA nor the logic of the amendments can support a narrow reading of the term "claimant."

### D. Character of Williams' Claims

In defining the types of claims against health care providers constituting HCLCs, the question we face is not whether it seems that a claimed injury really arose from treatment commonly understood to be some type of medical or health care; nor do we address whether the incident causing the injury would have been a common law negligence claim. Instead, the issue posed is whether the umbrella fashioned by the Legislature's promulgation of the TMLA includes the cause of action brought by a claimant against physicians or health care providers.

The foundations of our analysis are well established. As in Diversicare and Marks, we determine whether the relevant allegations are negligence claims or are properly characterized as HCLCs under the Act. Marks, 319 S.W.3d at 662 (construing the TMLIIA); Diversicare, 185 S.W.3d at 847.

An HCLC contains three basic elements:[4] (1) a physician or health care

4. " 'Health care liability claim' means a cause of action against a health care provider or

provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission complained of must proximately cause the injury to the claimant. *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13); *Marks,* 319 S.W.3d at 662 (construing the similar definition found in the TMLIIA).

The second element is at issue in this case: whether Williams' claims alleging West Oaks' failure to properly train the facility's staff, warn of risks associated with violent psychiatric patients, provide adequate protocols and equipment to limit such risks, and provide a safe work environment under such circumstances implicate one or more of the standards listed in the HCLC definition. There are several types of HCLCs set out in the TMLA: in addition to claims involving treatment and lack of treatment, the Act contemplates claims for alleged "departure[s] from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). All of these categories of claims, except safety, are defined terms in the Act. *See, e.g., id.* § 74.001(a)(10), (a)(19), and (a)(24) (defining "health care," "medical care," and "professional or administrative services"). West Oaks asserts that Williams' claims allege departures from accepted standards of either "health care" or "safety." Williams argues that neither of these categories of claims ap-

plies to his allegations, removing him from the Act's reach.

## 1. Claimed Departures from Accepted Standards of Health Care

We examine whether Williams' complaints are "claimed departure[s] from accepted standards of . . . health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). In *Diversicare,* we held that a claim alleges a departure from accepted standards of health care if the act or omission complained of is an inseparable or integral part of the rendition of health care. 185 S.W.3d at 848, 850. "[T]raining and staffing policies and supervision and protection of [patients] . . . are integral components of a [health care facility's] rendition of health care services . . . ." *Id.* at 850. Williams' claims are similar to the health care claims at issue in *Diversicare.* However, our analysis of health care claims in that case involved claims by a patient against a health care provider, not, as in this case, claims brought by a non-patient employee against his employer.

The definition for "health care" suggests that claims brought under this prong of the HCLC definition must involve a patient-physician relationship. *See id.* § 74.001(a)(10). "Health care" is:

> . . . *any act* or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a *patient* during the *patient's* medical care, treatment, or confinement.

*Id.* § 74.001(a)(10)(emphases added); *see also, e.g., Omaha Healthcare Ctr.,* 344 S.W.3d at 395 (pointing to the "any act" language in the "health care" definition as necessarily implicating more than acts of

---

physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which

proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

physical care and medical diagnosis and treatment); *Diversicare*, 185 S.W.3d at 847 (noting the "broad[ ]" nature of the "health care" definition). While the "any act" language of the "health care" definition is certainly expansive, it is limited by the requirement that health care be rendered "for, to, or on behalf of a *patient* during the *patient's* medical care, treatment, or confinement." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphases added). Because a claim under the health care prong of section 74.001(a)(13) incorporates the definition of "health care," such a claim must involve a patient-physician relationship.

■ The requirement that a claim arising under the health care prong of section 74.001(a)(13) involve a patient-physician relationship could be viewed as in tension with the term "claimant," defined in terms of a person. *See id.* § 74.001(a)(2). We consider all the relevant provisions of the TMLA together and follow the rule that specific statutory provisions prevail over more general provisions. *See Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 297 (Tex.2011) (reiterating the rule that "a specific statutory provision prevails as an exception over a conflicting general provision") (citing *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex.2010)); *see also* TEX. GOV'T CODE § 311.026(b) (same). However, the specific wording of the "health care" definition, that health care be an act involving treatment rendered for, to or on behalf of a patient, acts as a limitation on the general provision that an HCLC need only be pursued by a "claimant." While other categories of HCLCs need only be pursued by claimants, by specific statutory directive health care claims must involve a patient-physician relationship.

■ Claims based on departures from accepted standards of health care therefore involve a nexus between the standard departed from and the alleged injury. Such a nexus exists in this case. Williams, a health care provider for Vidaurre, was assaulted by Vidaurre, who was a West Oaks patient. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(12) (defining "health care provider" to include employees of facilities licensed to provide health care). Williams was acting on orders to provide one-on-one supervision for Vidaurre. That directive was made by a West Oaks physician exercising professional judgment about the schizophrenic patient's care and treatment, including, specifically, heightened supervision in light of recent aggressive and violent behavior. Additional professional judgments about the safety protocols for such patients were put in place by West Oaks to care for its mental patients. Williams alleges that these judgments, concerning his training and psychiatric institutional protocols, departed from accepted standards of care and caused his injury. We previously reasoned in *Diversicare* that the health care facility's "training and staffing policies and supervision and protection of [a patient] and other residents are integral components of [the facility's] rendition of health care services." 185 S.W.3d at 850. Williams' similar allegations constitute HCLCs based on claimed departures from accepted standards of health care.

Texas mental health statutes and regulations bolster this conclusion. West Oaks is a state-licensed, private mental health facility. The law requires that an inpatient mental health facility "provide adequate medical and psychiatric care and treatment to every patient in accordance with the highest standards accepted in *medical practice*." TEXAS HEALTH AND SAFETY CODE § 576.022(a)(emphasis added). Mental health hospitals may not operate in Texas

unless licensed by the Texas Department of Health and operated in accordance with the rules and standards of the Texas Board of Mental Health and Mental Retardation to ensure the proper care and treatment of patients. *Id.* § 577.001(a), 577.005(b), 577.010(a).

■ The necessity of expert testimony to support or refute the allegations at issue is a factor in assessing the nature of a claim against a health care provider or physician. *Diversicare,* 185 S.W.3d at 848. Here, the court of appeals considered the need for expert testimony in Williams' case and concluded that "even if medical expert testimony is necessary to establish Williams' claims, the need for expert testimony is not dispositive as to whether a claim is a health care liability claim." 322 S.W.3d at 353. We have indicated that even when expert medical testimony is not necessary, the claim may still be an HCLC. *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005) ("The fact that in the final analysis, expert testimony may not be necessary to support a verdict does not mean the claim is not a health care liability claim."). We have not previously addressed the court of appeals' reasoning, and we now hold that if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim.

■ Expert testimony in the health care field is necessary to support Williams' claims. Those claims require evidence on proper training, supervision, and protocols to prevent, control, and defuse aggressive behavior and altercations in a mental hospital between psychiatric patients and employed professional counselors who treat and supervise them. The provision of emergency notification devices, warning of dangers associated with psychiatric patients, providing a safe workplace, and properly training the caregiver at a psychiatric facility are integral to the patient's care and confinement. Acts or treatment that are integral to a "patient's medical care, treatment, or confinement" constitute "health care." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10). Claims for injuries arising from departures from proper "treatment performed or furnished, or that should have been performed or furnished" are health care claims. *Id.* § 74.001(a)(10). Contrary to Williams' argument, this dispute concerns more than simply determining whether a person should be protected from a known aggressive person. The dispute between Williams and West Oaks is, at its core, over the appropriate standards of care owed to this mental health professional in treating and supervising a psychiatric patient at the mental hospital, what services, protocols, supervision, monitoring and equipment were necessary to satisfy the standard, and whether such specialized standards were breached. *See Diversicare,* 185 S.W.3d at 850. The allegedly missing or insufficient protocols and standards were for a mental patient in a mental hospital. It would blink reality to conclude that no professional mental health judgment is required to decide what those should be, and whether they were in place at the time of Williams' injury.[5]

5. As we discussed in *Diversicare,* a number of other states also recognize that providing supervision and a safe environment at a health care facility are matters of professional health care judgment. 185 S.W.3d at 852–54 (citing *Dorris v. Detroit Osteopathic Hosp.,* 460 Mich. 26, 594 N.W.2d 455, 466 (1999) (concluding that claims for assault in a psychiatric hospital implicated medical or health care under Michigan's medical malpractice statute and noting that "[t]he ordinary layman does not know the type of supervision or monitoring that is required for psychiatric patients in a psychiatric ward."); *Smith v. Four Corners Mental Health Ctr.,* 70 P.3d 904, 914 (Utah 2003) (holding that an assaulted child's law-

Williams' argument that any security officer could have performed the oversight and supervision of a psychiatric patient at the mental health hospital is overly simplistic. Perhaps a security officer could have protected Williams, and Vidaurre himself, from harm, or lessened the severity of the injuries suffered, but security is only one aspect of the matter. Williams' position at West Oaks involved professional, health-care-related judgments different from the tasks typically associated with a law enforcement officer, security guard, or bouncer. Treatment of a mental patient subject to psychotic and aggressive outbursts requires health care, not simply protection from bodily harm, to control, defuse, or prevent mental processes leading to aggression, and professional techniques to do so. Patients at West Oaks are there not merely for shelter, but also for care and treatment. *See Charrin v. Methodist Hosp.*, 432 S.W.2d 572, 574 (Tex.Civ.App.—Houston [1st Dist.] 1968, no writ) (holding that the hospital-patient relationship is different from that of a landlord-tenant). Williams' self-described role at West Oaks was that of a "counselor" and "caregiver," not a security guard. One of Vidaurre's experts characterizes psychiatric technicians as a "valuable and indispensable part of psychiatric hospital care." Vidaurre's expert also notes that the role of psychiatric technician involves appropriately observing and evaluating potentially assaultive mentally ill patients

and assessing the potential for violent eruptions. Thus, the very deficiencies in training and protocols Williams complains of underscore the health-related nature of his role.

■ We do not conclude, as West Oaks would have us, that Williams' claims should be considered HCLCs on the bare basis that they mirror those of the patient and stem from the same fact pattern. Williams and the patient stand as separate claimants. We analyze the applicability of the TMLA and its attendant procedural requirements on the gist of the claimant's allegations. *See Diversicare*, 185 S.W.3d at 847–48.

**2. Claimed Departures from Accepted Standards of Safety**

■ We also examine whether Williams' claims may be characterized as HCLCs under the definition's "safety" prong. We have not decided whether safety claims must be "directly related to health care." The TMLA's HCLC definition includes, among the different types of covered claims, "claimed departure[s] from accepted standards of ... safety...." Tex. Civ. Prac. & Rem.Code § 74.001(a)(13).

Williams was injured during an altercation with Vidaurre in a smoking area at the hospital, and he contends his injuries would have been avoided if West Oaks had instituted proper safety protocols and monitoring devices. Williams' claims, predicated upon the monitoring and re-

suit against the outpatient mental health care provider was a health care malpractice claim because the plaintiff's "allegations arise out of the fact that [a health care provider] provided mental health services directly to him....")); *see also D.P. v. Wrangell Gen. Hosp.*, 5 P.3d 225, 229 n. 17 (Alaska 2000) ("[I]n so far as [plaintiff] intends to argue issues that involve specialized medical decisions—such as the appropriate level of physical restraints or medication—she can do so only through expert testimony."); *Bell v. Sharp Cabrillo*

*Hosp.*, 212 Cal.App.3d 1034, 260 Cal.Rptr. 886, 896 (1989) ("[T]he competent selection and review of medical staff is precisely the type of professional service a hospital is licensed and expected to provide, for it is in the business of providing medical care to patients and protecting them from an unreasonable risk of harm while receiving medical treatment.... [T]he competent performance of this responsibility is 'inextricably interwoven' with delivering competent quality medical care to hospital patients.").

straint of violent, schizophrenic patients, implicate the safety, as commonly understood, of employees and patients. Safety is not defined in the TMLA. This Court has construed the term, under principles of statutory construction, according to its commonly understood meaning as the condition of being "untouched by danger; not exposed to danger; secure from danger, harm or loss." *Diversicare*, 185 S.W.3d at 855 (quoting the definition of "safe" in Black's Law Dictionary (6th ed.1990) to construe the meaning of "safety" under predecessor statute). Logically, the inclusion of safety "expand[ed] the scope of the statute beyond what it would be if it only covered medical and health care" and included the claims in that case, and it was not necessary to define the precise boundaries of the safety prong. *Diversicare*, 185 S.W.3d at 855; *see also Marks*, 319 S.W.3d at 662–63.

■ In 2003, the Legislature modified the definition of HCLCs. It changed "patient" to "claimant," and also added the italicized phrase to the relevant portion of the pre–2003 definition: HCLC means a cause of action for a "claimed departure from accepted standards of medical care, or health care, or safety *or professional or administrative services directly related to*

*health care*, which proximately results in injury to or death of a claimant. . . ." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13)(emphasis added). The dissent argues that the 2003 amendment was intended to narrow the existing scope of the safety prong of HCLCs by requiring that safety be "directly related to health care."[6] *See id.* We disagree for several reasons.

Safety was in the Act prior to the 2003 amendments and this Court construed it according to its common meaning as being secure from danger, harm or loss. *Diversicare*, 185 S.W.3d at 855. The phrase "directly related to health care" was added to the definition of HCLCs in 2003 to modify "professional or administrative services." *Compare* TEX.REV.CIV. STAT. art 4590i, § 1.03(a)(4) (repealed 2003), *with* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 865.

■ Scrutinizing grammar in interpreting statutes, we are cognizant of the rule that "[m]odifiers should come, if possible, next to the words they modify." William Strunk, Jr. & E.B. White, THE ELEMENTS OF STYLE R. 30 (4th ed. 2000); *see also* Bryan A. Garner, GARNER'S MODERN AMERICAN USAGE 523 (2003) (noting that "[w]hen modifying words are separated

---

**6.** Texas appellate courts construing the TMLA have diverged on whether "directly related" applies to safety claims or only to other claims in the definition's list of departures from accepted standards. *Compare St. David's Healthcare P'ship, L.P. v. Esparza*, 315 S.W.3d 601, 604 (Tex.App.—Austin 2010), *rev'd on other grounds*, 348 S.W.3d 904 (Tex. 2011) ("'directly related to health care" modifies "safety"); *Appell v. Muguerza*, 329 S.W.3d 104, 115 (Tex.App.—Houston [14th Dist.] 2010, pet. filed) (same); *Dual D Healthcare Operations, Inc. v. Kenyon*, 291 S.W.3d 486, 489–90 (Tex.App.—Dallas 2009, no pet.) (same); *Omaha Healthcare Ctr., L.L.C. v. Johnson*, 246 S.W.3d 278, 284 (Tex.App.— Texarkana 2008), *rev'd on other grounds*, 344 S.W.3d 392 (Tex.2011) (same); *Harris Meth-*

*odist Ft. Worth v. Ollie*, 270 S.W.3d 720, 723 (Tex.App.—Fort Worth 2008), *rev'd on other grounds*, 342 S.W.3d 525 (Tex.2011) (same); *Christus Health v. Beal*, 240 S.W.3d 282, 289 (Tex.App.—Houston [1st Dist.] 2007, no pet.) (same); *Valley Baptist Med. Ctr. v. Stradley*, 210 S.W.3d 770, 774–75 (Tex.App.—Corpus Christi 2006, pet. denied) (same), *with Holguin v. Laredo Reg'l Med. Ctr., L.P.*, 256 S.W.3d 349, 354–55 (Tex.App.—San Antonio 2008, no pet.) (safety claim need not be directly related to health care); *Emeritus Corp. v. Highsmith*, 211 S.W.3d 321, 328 (Tex. App.—San Antonio 2006, pet. denied) ("[A] claim may be a 'health care liability claim' under the safety definition even if it does not 'directly relate[ ] to healthcare.' ").

from the words they modify, readers have a hard time processing the information," and adding that "the true referent should generally be the closest appropriate word."). This rule is related to the last antecedent doctrine of statutory interpretation commonly applied to ambiguous legislative texts. 82 C.J.S. STATUTES § 443 (2011) (footnotes omitted). Under that tenet, a qualifying phrase should be applied only to the portion of the sentence "immediately preceding it." *City of Dallas v. Stewart*, 361 S.W.3d 562, 571 n. 14 (Tex.2012) (applying the doctrine); *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex.2000) (same). Accordingly, the phrase "directly related to health care" modifies the terms immediately before it—"professional or administrative services." Under the dissent's logic, the phrase "directly related to health care" should be applied to modify each term in the HCLC definition, including professional or administrative services, safety, health care, and medical care. This construction is nonsensical, as it would be entirely redundant as to health care and medical care, unsupported by the text in the attempted application to safety, and render safety largely repetitive of health care. *See Marks*, 319 S.W.3d at 673 (Johnson, J., concurring) (pointing out that safety and health care are separate). We explained in *Diversicare*, a patient-assault case also involving training and staffing policies and monitoring and protection of

patients, that "[p]rofessional supervision, monitoring, and protection of the patient population necessarily implicate the accepted standards of safety." *Diversicare*, 185 S.W.3d at 855. Williams' similar complaints here concerning his protection from danger at the hands of a mental patient also implicate safety.[7]

Moreover, a majority of the members of this Court have opined in written opinions or joined written opinions reasoning that safety is not constricted by the subsequent addition to the statute of the phrase "professional or administrative services directly related to health care." Concurring and dissenting in *Diversicare*, Chief Justice Jefferson wrote that safety, undefined in the statute, is commonly understood to mean protection from danger and that the "specific source of that danger ... is without limitation." 185 S.W.3d at 860–61 (Jefferson, C.J., concurring and dissenting) (also noting that "[i]n defining health care liability claims as it did, the Legislature created a statute with a broad scope. Complaints about the breadth of [the TMLIIA] should be directed to the Legislature, not to this Court, for the courts must 'take statutes as they find them.'" (citation omitted)). Concurring in *Marks*, Justice Johnson agreed with Chief Justice Jefferson's analysis of safety in his concurrence and dissent in *Diversicare*. Justice Johnson reasoned that making safety contingent on a direct connection between it

---

7. We explained in *Diversicare* that the claimant's allegations of deficient monitoring and training are distinct from hypothetical claims for injuries arising out of an intruder assaulting a claimant due to an unlocked window or a claimant falling from a rickety staircase. 185 S.W.3d at 854. These examples, however, did not concern our analysis of HCLCs that were alleged departures from accepted standards of safety. They were instead provided as examples of claims that would be separable from health care under the health care prong of the HCLC definition. *Id.* (con-

struing the TMLIIA). *Diversicare*'s only holding as to the scope of claims based on alleged departures from accepted standards of safety was that inclusion of the term safety in the HCLC definition expanded the reach of the statute and that it was broad enough to include the claimants' claim in that case. *Marks v. St. Luke's Episcopal Hosp.*, No. 07–0783, 52 Tex.Sup.Ct.J. 1184, 2009 WL 2667801, 2009 Lexis 636, at *39 (Tex. August 28, 2009) (Wainwright, J., dissenting), *opinion withdrawn and substituted on rehearing*, 319 S.W.3d 658 (Tex.2010).

and health care would "effectively read[ ] safety out of the statute instead of properly giving it meaning as an additional category of claims." *Marks*, 319 S.W.3d at 673 (Johnson, J., concurring, joined by Justice Willett, Justice Hecht, and Justice Wainwright).[8] Chief Justice Jefferson wrote again in *Marks*, quoting his concurrence and dissent in *Diversicare*, noting that a reasonable construction of "safety" is to give the term its "common meaning," which could therefore encompass premises liability claims. *Id.* at 674 (Jefferson, C.J., concurring and dissenting, joined by Justices Green, Guzman and Lehrmann).

We agree with West Oaks that Williams' claims are indeed for departures from accepted standards of safety. We conclude that the safety component of HCLCs need not be directly related to the provision of health care and that Williams' claims against West Oaks implicate this prong of HCLCs.

### E. Relationship with the Texas Workers' Compensation Act

■ Williams also contends that interpreting the TMLA to encompass his claims will conflict with the procedural and substantive litigation rights granted to employee plaintiffs under the TWCA. *See* Tex. Lab.Code § 406.001 *et seq.* He argues that his personal injury claims against his employer should not be characterized as HCLCs because the Legislature did not intend for employee claims against a health care provider employer to fall under the rubric of the Act. Williams also contends that an employee's personal injury claim against his employer would not have constituted a medical malpractice claim prior to the enactment of the medical liability statutes in 1977.

We see no conflict between the TMLA and the TWCA, whether the claim at issue is asserted against an employer subscribing to workers' compensation insurance or, as here, against a nonsubscriber. The TWCA is unique in permitting private Texas employers to elect to subscribe to workers' compensation insurance. *Id.* § 406.002(a); *Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 552 (Tex.2001); *see also Casados*, 358 S.W.3d at 241. If they so elect, and their employees do not opt out of the workers' compensation coverage, then their employees are generally precluded from filing suit against them and must instead pursue their claims through an administrative agency against the employer's insurance carrier for benefits provided for in the TWCA. *See* Tex. Lab.Code § 406.031(a) (noting that an employer's insurance carrier is liable for compensation of an employee's injury if the employee is subject to the Act and the injury arises out of the course and scope of the employment). But employees need not prove the employer's negligence for workers' compensation recovery, just that they were injured in the course and scope of employment. *See id.* ("An insurance carrier is liable for compensation for an employee's injury without regard to fault or negligence...."); *id.* § 406.002(b) (stating that a subscribing employer is subject to the TWCA). As part of the legislated policy trade-off underlying the workers' compensation system, employees are also limited in their recovery to indemnity and medical expenses, absent intentional conduct. *See id.* § 408.001(a) ("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage...."); *but see id.* § 408.001(b) (allowing recovery of exemplary damages for

---

8. Justices Hecht and Wainwright joined Justice Johnson's concurrence in *Marks,* except

for the discussion of "safety." 319 S.W.3d at 667.

death caused by an intentional act or omission or the employer's gross negligence).

However, if an employer forgoes workers' compensation coverage, and is a nonsubscriber to the workers' compensation system, it is subject to suits at common law for damages. With the exception of certain employer defenses abrogated by the statute, a suit by an employee of a nonsubscribing employer is largely outside the limitations imposed by the TWCA. *See id.* § 406.033(a), (d) (discussing limited defenses and employee burden of proof in establishing negligence). Employees of a nonsubscriber, injured on the job, must prove the elements of a common law negligence claim, absent intentional misconduct. *Id.* § 406.033(d). An employee may also elect to waive workers' compensation coverage and "retain the common-law right of action to recover damages for personal injuries or death" if certain notification requirements are met. *Id.* § 406.034(a), (b).

■■■ Thus, the workers' compensation construct contemplates two systems, one in which covered employees may recover relatively quickly and without litigation from subscribing employers and the other in which nonsubscribing employers, or the employers of employees who have opted not to accept workers' compensation coverage, are subject to suit by injured employees to recover for their on-the-job injuries. "In providing the worker a form of prompt remuneration for loss of earning capacity, the statutory [workers' compensation] scheme is in lieu of common law liability based on negligence." *Paradissis v. Royal Indem. Co.,* 507 S.W.2d 526, 529 (Tex. 1974); *see also Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 407 (Tex.1985) ("The system balances the advantage to employers of immunity from negligence and potentially larger recovery in common law actions against the advantage to employees of rel-

atively swift and certain compensation without proof of fault.").

Just as the workers' compensation system treats employees of subscribing versus nonsubscribing employees differently, the treatment of those two differently situated employees under the TMLA for on-the-job injuries is also distinct. The employee of a subscriber that is a health care provider must pursue an administrative remedy under the TWCA for on-the-job injuries. However, the employee of a nonsubscribing employer that is a health care provider must file suit against the nonsubscriber and follow the rules that govern that suit. In this case, the governing rules include the TMLA's requirements for a claimant suing a health care provider. Other proceedings to recover against nonsubscribing employers would similarly be governed by applicable statutes and rules, e.g., proof of negligence and causation, notice requirements under the Texas Tort Claims Act, or the common pleading and service requirements in the Texas Rules of Civil Procedure for all lawsuits.

Williams invites us to read into the TMLA an exception for claimants happening to be employees of nonsubscriber health care provider employers who sue their employers for claims that come under the TMLA umbrella. Williams' case is against a nonsubscriber, outside of the workers' compensation system, yet he implores the Court to except him from the TMLA's requirements without any express statutory exception. He seeks a common law exemption from the TMLA's mandate that we are not willing to create.

As explained, the TWCA and the TMLA do not conflict in this case. But even if they did, the Legislature has already designated the victor—the TMLA would prevail. Section 74.002(a) of the TMLA states:

In the event of a conflict between this chapter and another law, including a rule of procedure or evidence or court rule, this chapter controls to the extent of a conflict.

TEX. CIV. PRAC. & REM.CODE § 74.002(a). This provision was added as part of the 2003 amendments and replaced an earlier, more cabined conflicts provision. *See* TEX. REV.CIV. STAT. art. 4590i, § 11.05 (repealed) (entitled "Subchapter's Application Prevails Over Certain Other Laws" and stating that "[t]he provisions of this subchapter shall apply notwithstanding the provisions contained in Article 4671, Revised Civil Statutes of Texas, 1925, as amended, and the provisions of Article 5525, Revised Civil Statutes of Texas, 1925, as amended" (pertaining to injuries resulting in death and survival of cause of action, respectively)).[9]

Here, Williams must establish the medical negligence of West Oaks to recover under the TMLA. The statute requires expert reports to support his claims.

### III. Response to Dissent

At base, the dissent's position is that, notwithstanding the Legislature's substitution of the term "claimant" for "patient" in the TMLA's HCLC definition, HCLCs are only those in which the defendant has a patient-physician or "patient-health-care-provider" relationship with the plaintiff. In spite of the Act's words, the dissent proffers that the Court strays from the language of the Act and undermines its purpose. *See* 371 S.W.3d at 199–200 (Lehrmann, J., dissenting). The chart below vividly illustrates the Legislature's broad intention and refutes the dissent's position.

| TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003) (emphases added) | TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) (amended 2003) (emphases added) |
| --- | --- |
| "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death *of the patient*, whether the *patient's claim or cause of action* sounds in tort or contract. | "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death *of a claimant*, whether the *claimant's claim or cause of action* sounds in tort or contract. |

As explained in Parts II.B and C above, in 2003 the Legislature modified the scope of HCLCs when it deleted "patient" and inserted the broader term "claimant" in the definition. *Compare* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13), *with* TEX.REV. CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed

2003). A claimant need not be the patient in all HCLCs.

As discussed above, two of the different types of HCLCs have specific definitions. The "medical care" and "health care" definitions both refer to services rendered for, to, or on behalf of a *patient* during the *patient's* care,[10] treatment, or confinement.

9. Articles 4671 and 5525 were both repealed prior to the 2003 amendments as part of the Legislature's 1985 adoption of the Texas Civil Practice and Remedies Code. TEX.REV.CIV. STAT. arts. 4671 and 5525, repealed by Act of

June 16, 1985, 69th Leg., R.S., ch. 959, § 9(1), 1985 Tex. Gen. Laws 3242, 3322.

10. There is a slight variance between the definitions for "health care" and "medical care." The "health care" definition features the

Tex. Civ. Prac. & Rem.Code § 74.001(a)(10), (a)(19); *see id.* at § 74.001(a)(13). Although HCLCs, as defined, include causes of action against health care providers brought by "claimants," the specific incorporation of the patient relationship for health care and medical care claims governs the HCLC for departures from accepted standards of medical care and health care. *See Jackson,* 351 S.W.3d at 297 (holding that specific statutory provisions override general provisions). However, that limitation does not apply to claims of safety, which is not defined with reference to a patient.[11] Tex. Civ. Prac. & Rem.Code § 74.001(a)(13). Contending that only patients' claims may be considered HCLCs, the dissent argues, in essence, that the 2003 amendment is a nullity and seeks to have the Court rewrite section 74.001(a)(13). We decline to do so.

 This is a statutory construction case. Our role "is to determine and give effect to the Legislature's [expressed] intent." *McIntyre,* 109 S.W.3d at 745. Such cases may offer the temptation to shoehorn a desired legislative result. But the Legislature changed "patient" to "claimant," and "claimant" is broader than "patient." Aside from claims alleging negligent medical care or health care, a claim need not involve a patient-physician relationship for it to be an HCLC.

The dissent argues several other points which we address briefly. The dissent contends that other provisions of the TMLA should trump the definition of HCLCs.

 (1) *Notice of suit and medical records release provisions.* The dissent similarly notes that inclusion of non-pa-

tients as claimants would render the notice of suit to health care providers, and accompanying medical-records releases, to health care providers, questionable. 371 S.W.3d at 195 (Lehrmann, J., dissenting) (citing Tex. Civ. Prac. & Rem.Code §§ 74.051, .052). The Act requires "any person" asserting an HCLC to provide notice to the defendant physician or health care provider. Tex. Civ. Prac. & Rem.Code § 74.051(a). This notice must be accompanied by the medical-records release form detailed in section 74.052. *Id.* § 74.052; *Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 73 (Tex.2011). Further, all parties are entitled to "complete and unaltered copies of the patient's medical records." Tex. Civ. Prac. & Rem.Code § 74.051(d). The form of notice provides a release including the name of the "patient." *Id.* § 74.052(c)(A), (B). As the dissent correctly observes, the Legislature's purpose for the notice and disclosure requirements was to encourage the parties to negotiate and settle disputes prior to suit. 371 S.W.3d at 195 (Lehrmann, J., dissenting); *Carreras,* 339 S.W.3d at 73 (citing *Garcia v. Gomez,* 319 S.W.3d 638, 643 (Tex.2010)). However, nothing in the language of the notice and disclosure provisions or in their purpose of encouraging pre-suit negotiation and settlement indicates a legislative intent that in all cases a claimant must be a patient or her representative.

The dissent contends that the parties' right to medical records cannot be applied against a third-party patient, such as Vidaurre. Specifically, the dissent points out that medical-privacy laws may prevent the parties from compelling a person such as Vidaurre, who is not a party to this case

---

word "medical" between the words "patient's" and "care." The "medical care" definition does not feature this word. Tex. Civ. Prac. & Rem.Code § 74.001(a)(10), (a)(19).

11. The scope of claims for "professional or administrative services directly related to health care" in the HCLC definition is not at issue in this case.

pursuing a claim under the TMLA, from supplying his medical records. 371 S.W.3d at 195 (Lehrmann, J., dissenting). JUSTICE LEHRMANN's point is well taken, but not in this case. Williams is the claimant in this case and these requirements should be applied to him. For purposes of his own medical records, Williams would be the "patient" referenced in the authorization form. See TEX. CIV. PRAC. & REM.CODE § 74.052(c)(A). In alignment with the broadly defined "claimant," the notice provision makes clear at the outset that it applies to "any person" asserting an HCLC, as opposed to a "patient" or representative. Id. §§ 74.001(a)(2), .051(a). In turn, the disclosure requirements allow not only for the release of records of a patient-plaintiff, but also the pre- and post-injury records of non-patient plaintiffs seeking recovery for her post-injury damages. See id. § 74.052 (predicating the disclosure requirements on the applicability of section 74.051(a)). Such records would bear directly in assessing the extent of damages and would streamline settlement negotiations, regardless of whether the claimant was a patient of the health care provider being sued.

(2) *Expert report provisions.* The dissent similarly asserts that the Act's definition of "expert report" and discussion of expert qualifications means that HCLCs must be based on a patient-physician relationship because those provisions contain references to departures from accepted standards by physicians or health care providers and knowledge of accepted standards for diagnosing, caring, or treating the illness, injury, or condition at issue in the claim. 371 S.W.3d at 195–96 (Lehrmann, J., dissenting) (discussing TEX. CIV. PRAC. & REM.CODE §§ 74.351(r)(6), .401(a)(2), .402(a)(2)). The fact that experts submitting reports have knowledge of the alleged standards at issue does not logically lead to a conclusion that only a

patient's suit against a health care provider can constitute an HCLC, especially when such a conclusion conflicts with the Legislature's substitution of "claimant" for "patient" in the TMLA's definition of HCLCs. Similarly, the dissent's point that the "expert report" definition calls for a discussion of the manner in which the care rendered by the physician or health care provider failed to meet standards does not lead to the conclusion that only the patient at the receiving end of that care can be a "claimant" under the Act. Id. § 74.351(r)(6); see also id. § 74.001(a)(2). An expert report detailing the departure from standards would still be relevant in a case, such as this, where a non-patient alleges that the health care provider's deviations from accepted standards led to his injury. As explained, expert testimony is necessary to specify the departure from accepted standards leading to the injury. Id. § 74.351(r)(6). The Act's requirement that an expert be qualified to give an opinion on the standards at issue does not, as the dissent contends, indicate that the condition at issue must be sustained by a patient. The expert report requirement is intended to effectuate the TMLA's objective that only meritorious causes of action proceed, not define the scope of HCLCs. See Samlowski v. Wooten, 332 S.W.3d 404, 416 (Tex.2011) (Wainwright, J., dissenting in part).

(3) *Jury instructions.* The dissent observes that one of the jury instructions required by the Act in jury trials includes a caution that a finding of negligence may not be based solely on evidence of a "bad result" to the claimant, but a bad result may be considered in determining negligence. 371 S.W.3d at 196 (Lehrmann, J., dissenting) (citing TEX. CIV. PRAC. & REM. CODE § 74.303(e)(2)). Drifting again from the statutory text directly at issue, the dissent argues that this instruction "only

makes sense" in the context of a patient dissatisfied with medical or health care services delivered by a health care provider. We fail to see the logic in this argument. "Bad result" is not defined, making it difficult to limit its meaning exclusively to health care or medical care, as the dissent would do. The Act indicates that a "bad result" is merely a fact that may be considered in a negligence finding. To conclude from this provision that the Legislature intended to include only patients under the Act, when it expressly broadened the HCLC definition, is not logical and would render the revisions to the more relevant HCLC definition meaningless.

(4) *Re-interpretation of Diversicare.* Our opinion today is consistent with our earlier construction of the HCLC definition in *Diversicare,* 185 S.W.3d at 847 (noting that "we examine the underlying nature of the claim and are not bound by the form of the pleading"). The dissent contends that we stray from *Diversicare* and its progeny by centering our analysis on the nature of the claims at issue. 371 S.W.3d at 196–97 (Lehrmann, J., dissenting). The dissent erroneously argues that *Diversicare* requires courts to place equivalent emphasis on the relationship between the parties. Specifically, the dissent contends that in *Diversicare* we attached "equal" importance to the "claimant's status as a patient" at a health care facility. *Id.; see Diversicare,* 185 S.W.3d at 850. However, in *Diversicare* we discussed that relationship, not because it was determinative in the scope of HCLCs generally, but because those were the facts of the case we were deciding. *Diversicare,* 185 S.W.3d at 850. The standards for the conduct at issue, rather than the form of pleadings or identity of parties, are paramount in classifying HCLCs. *See Yamada v. Friend,* 335 S.W.3d 192, 196 (Tex.2010) ("Artful pleading does not alter [the nature

of the underlying claim].”); *Omaha Healthcare,* 344 S.W.3d at 394 (similar).

(5) *Importance of the 2003 amendments.* Incredibly, the dissent contends that the Court places "undue importance" on the Legislature's modification of the HCLC definition in 2003, substituting the broader term "claimant" for "patient" in identifying who may bring a claim. 371 S.W.3d at 193–94 (Lehrmann, J., dissenting); TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). The dissent would interpret that modification as referring to the estate or direct representatives of a patient-plaintiff, parties that have always been permitted to make a claim, even prior to the 2003 amendment. *See* 371 S.W.3d at 197 (Lehrmann, J., dissenting); *see also* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(9), 4.01 (repealed 2003). First, focusing on the language of the statutory definition at the center of this case does not give it "undue importance." Second, the dissent's construction is contrary to established rules of statutory construction. As we note in Parts II. B and C, "claimant" is defined as "a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(2). Thus, aside from claims involving health care or medical care and claims based on treatment, a direct healthcare-provider-to-patient relationship is not required for claims to constitute HCLCs.

(6) *Construction of "safety."* The dissent argues that this issue has not been properly raised. 371 S.W.3d at 198 (Lehrmann, J., dissenting). However, West Oaks presents the safety-related nature of its claims in its briefing, and the court of appeals analyzed Williams' claims as safety claims. 322 S.W.3d 349, 352. Contrary to the dissent's assertions, our construction of "safety" is based not only on established canons of textual construc-

tion, but also on our interpretation of safety based on its commonly understood meaning. *See Diversicare*, 185 S.W.3d at 855. Further, following principles of statutory construction, our construction of "safety" prevents the term from becoming meaningless surplusage, subsumed into claims based on departures from accepted standards of "health care." *See* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13).

(7) *Balance between the TMLA and TWCA.* Contending that our assessment of Williams' claims as HCLCs "forc[es]" them into the HCLC "mold" and "significantly disrupts the delicate balance between employee and employer interests" motivating the TWCA, the dissent argues that our reasoning alters the incentive structure in the TWCA intended to penalize nonsubscribing employers. 371 S.W.3d at 199 (Lehrmann, J., dissenting). However, contrary to the implication of the dissent, the TWCA does not create an especially punitive litigation regime for nonsubscribing employers. Rather, as noted above, nonsubscribing employers are divested of several common law defenses. *See* TEX. LAB. CODE § 406.033(a); *see also Kroger Co. v. Keng*, 23 S.W.3d 347, 349–50 (Tex.2000) (describing the limitation of defenses of nonsubscribers as a "penalty" meant as an incentive for employers to subscribe to workers' compensation insurance). However, the plaintiff must prove the negligence of the nonsubscribing employer or the employer's agent. TEX. LAB.CODE § 406.033(d). As part of the negligence claim against a health care provider employer, an employee asserting a claim that is otherwise an HCLC must adhere to the expert report requirements of the TMLA. The dissent also argues that our reasoning will discourage small claims and implies that fewer employers will subscribe to workers' compensation insurance. 371 S.W.3d at 199 (Lehrmann, J., dissenting). However, because no information concern-

ing workers' compensation policies is in the record before us, the dissent's concerns are speculative at best. As described above, while we see no conflict between the TMLA and TWCA, the Legislature signaled its intent that the TMLA should control over contradictory statutory provisions. *See* TEX. CIV. PRAC. & REM.CODE § 74.002(a).

(8) *Legislative purpose of the TMLA.* Noting that one of the stated purposes of the Act is to reduce the frequency and cost of medical malpractice claims, the dissent concludes that our holding will result in a larger number of total HCLC claims, contrary to the Legislature's purpose. 371 S.W.3d at 199–200 (Lehrmann, J., dissenting). Given the number of claims filed against health care providers, many will be HCLCs and some may not be. The dissent would shift the balance so that many more are not HCLCs, which is contrary to the Legislature's change of "patient" to "claimant." We refuse to trump explicit statutory language with the dissent's view of the TMLA's purpose.

Finally, our conclusion that the Act covers claims by non-patients against health care providers is not new territory. The Fifth Court of Appeals has concluded that a non-patient hospital visitor's personal injury claim resulting from an on-premises patient assault was an HCLC. *Ammons*, 266 S.W.3d at 64. The court, citing *Diversicare*, concluded that the supervision and restraint of patients was at issue and constituted health care under the facts of that case. *Id.* The *Ammons* court correctly reasoned that no language in the Act required that a "claimant" also necessarily be a "patient." *Id.* at 60–62.

## IV. Conclusion

Williams claims that West Oaks failed to properly train, warn and supervise him to

work with potentially violent psychiatric patients and, as a result, failed to provide a safe workplace. In 2003, the Legislature broadened the definition of health care liability claims under the Texas Medical Liability Act by adding new types of claims under the HCLC definition and expanding the scope of persons included within the Act's purview. *Compare* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13), *with* TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4) (repealed 2003). We conclude that Williams' claims against West Oaks are properly characterized as health care liability claims based on claimed departures from accepted standards of health care and safety. Williams failed to provide an expert report in accordance with section 74.351(a). TEX. CIV. PRAC. & REM.CODE § 74.351(a). We therefore reverse the judgment of the court of appeals affirming the trial court's order denying West Oaks' motion to dismiss all of Williams' claims. Because West Oaks requested its attorney's fees and costs in the trial court pursuant to Texas Civil Practice and Remedies Code section 74.35 1(b)(1), we remand to that court with instructions to dismiss Williams' claims against West Oaks and consider West Oaks' request for attorney's fees and costs.

Justice LEHRMANN filed a dissenting opinion, in which Justice MEDINA and Justice WILLETT joined.

Justice LEHRMANN, joined by Justice MEDINA and Justice WILLETT, dissenting.

"A whole new world [of health care liability claims], hinted by opinions in the last few years, is here." *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 470 (Tex.2008) (Wainwright, J. dissenting). Interpreting a law designed to *reduce* the number of medical malpractice suits, the Court holds that an employee's claims against his employer for providing an unsafe workplace and inadequate training are health care liability claims. The Court's strained reading of the statute runs counter to express statutory language, the Legislature's stated purposes in enacting the current version of chapter 74, and common sense. Further, the Court's decision undermines the balance struck by the Legislature to encourage employers to become subscribers under the Workers Compensation Act. For these reasons, I am compelled to respectfully express my dissent.

## I. The Medical Liability Act Contemplates a Patient/Physician Relationship Between the Parties

**A. The Act's plain language indicates that it applies to claims alleging a breach of a health care provider's duty to a patient.**

Our primary objective in construing a statute "is to ascertain and give effect to the Legislature's intent by first looking at the statute's plain and common meaning." *Tex. Natural Res. Conservation Comm'n v. Lakeshore Util. Co.*, 164 S.W.3d 368, 378 (Tex.2005). We divine that intent by reading the statute as a whole, and we interpret the legislation to give effect to the entire act. *Id.* (citing *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)). Furthermore, we may look to the statutory context to determine a term's meaning. *City of Boerne*, 111 S.W.3d at 25. All of those tools lead to the conclusion that Williams's claims are not health care liability claims.

Under the Medical Liability Act, § 74.001 *et seq.*, a health care liability claim is

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional

or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). The Court concludes that Williams's suit against his employer for providing an unsafe workplace and inadequate training alleges health care liability claims, despite the lack of any physician-patient relationship between the health care provider and the claimant. 371 S.W.3d at 174. The Court first determines that Williams's claims are for a departure from health care standards because they "involve a patient-physician relationship." 371 S.W.3d at 181. Although that determination is more than enough to decide the case, the Court then reaches out to further expand the Act's scope by deciding that a claim under the "safety" prong of the health care liability claim definition need not be directly related to health care— even though Williams's claim *is,* in the Court's view—directly related to health care. Both conclusions are inconsistent with plain statutory language and sound statutory construction. The Act is replete with provisions indicating that a health care liability claim must be founded on a health care provider's alleged breach of a professional duty towards a patient. *See Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 851, 854 (Tex.2005). The Court's interpretation renders some of those provisions meaningless or nonsensical.

**1. Williams's claims are not "health care" claims, as the Court concludes.**

The Act defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider *for, to, or on behalf* of a patient *during the patient's medical care, treatment, or con-*

*finement."* TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphasis added). Plainly, the Legislature contemplated that a health care liability claim based upon a departure from standards of health care would stem from medical treatment directed toward a particular patient—"the patient" whose care, treatment, or confinement is the subject of the lawsuit.

Based largely on the Legislature's use of the term "claimant" rather than "patient" in the health care liability claim definition, the Court determines that a claim falls under the health care prong of the definition even absent a physician-patient relationship so long as a physician-patient relationship is "involved." 371 S.W.3d at 189. As set out in section I.B. below, the Court's analysis of the significance of the Legislature's use of "claimant" in the definition flows from an erroneous premise and is deeply flawed; the Court's reliance on the change ignores the fact that the Legislature used the term throughout the Act's predecessor, including in its statement of legislative purpose. More importantly, the Legislature did not say that a health care claim must "involve" a patient. Indeed, the word is found nowhere in the definition of health care or health care liability claim. Instead, health care claims arise from "act[s] or treatment furnished or that should have been furnished for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM.CODE § 74.001(a)(10) (emphasis added). Williams's claims allege that West Oaks failed to provide *him,* not the patient, adequate training and a safe work place.

Section 74.051 of the Act highlights the Court's error in concluding that the mere peripheral involvement of a patient transforms an ordinary negligence claim into a health care claim. That section requires health care liability claimants to provide

notice by certified mail to any health care provider against whom the claim is asserted sixty days before the claim is filed. TEX. CIV. PRAC. & REM.CODE § 74.051(a). The notice must be accompanied by a form authorizing the release of the medical records of *"the patient"* whose treatment is the subject of the claim. *Id.* §§ 74.051(d)("All parties shall be entitled to obtain complete and unaltered copies of the patient's medical records...."); 74.052(c)A, B. Under the Court's reading of the statute, Williams would be required to authorize or obtain authorization for the release of Vidaurre's medical records to pursue his suit against his employer. Obviously, medical privacy laws prevent Williams from authorizing the release of Vidaurre's medical records. 45 C.F.R. § 164.502(f) (providing that Health Insurance Privacy and Portability Act restrictions apply to deceased individuals). While the Legislature sought to reduce frivolous claims against health care providers, it sought to do so without unduly restricting claims with merit. It is inconceivable that the Legislature intended to require health care claimants with meritorious claims to be blocked by the refusal of third parties (the patients "involved") to authorize release of their medical records.

Moreover, even if Williams were somehow able to obtain authorization from Vidaurre's estate, the records would not serve the purpose sections 74.051 and 74.052 were designed to serve: to "'provide[ ] an opportunity for health care providers to investigate claims and possibly settle those with merit at an early stage.'" *Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 73 (Tex.2011) (quoting *In re Collins,* 286 S.W.3d 911, 916–17 (Tex. 2009)). Vidaurre's psychiatric diagnosis and violent tendencies are undisputed, and the records would have no bearing on the merits of Williams's claims against West

Oaks for allegedly providing an unsafe workplace and inadequate training.

The Court discounts the import of these sections, finding no language to suggest that employee/employer disputes like this case are not health care liability claims. But section 74.052, which describes the statutory authorization form that must accompany the statutory notice provides:

(c) The medical authorization required by this section shall be in the following form[ ]:

(A) I, _____ (name of *patient* [*not* claimant] or authorized representative), hereby authorize _____ (name of physician or other health care provider to whom the notice of health care claim is directed) to obtain and disclose ... the protected health information described below....

Other provisions of the Act, which provide the relevant statutory context, *see City of Boerne,* 111 S.W.3d at 25, shore up the conclusion that health care liability claims arise from a health care provider's breach of a duty toward a particular patient. I examine several below.

**2. The Court's interpretation is inconsistent with provisions governing the expert reports and the qualifications of experts.**

The Court reverses the court of appeals' judgment and remands to the trial court, instructing it to dismiss because Williams failed to comply with the expert report requirement of section 74.351. But the very definition of "expert report" belies the Court's conclusion that Williams's allegations state claims for health care liability. An "expert report" is defined as

a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care,

*the manner in which the care rendered by the physician or health care provider failed to meet the standards,* and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE § 74.351(r)(6)(emphasis added). The emphasized language clearly contemplates that the defendant health care provider has delivered health care services to a patient, who has allegedly been injured by the provider's departure from applicable standards. The Court minimizes the definition's significance by noting that "[t]he fact that experts submitting reports have knowledge of the alleged standards deviated from does not logically lead to a conclusion that only a patient's suit against a health care provider can constitute an HCLC...." 371 S.W.3d at 190. That suggestion, however, overlooks the provision's reference to the health care provider's rendition of care.

The sections of the Act governing the qualifications of experts who may author reports similarly show that a health care liability claim arises only from a patient/health care provider relationship. Section 74.041 establishes the necessary qualifications for an expert in a suit against a physician. Among other qualifications, the expert must "ha[ve] knowledge of accepted standards of medical care for the *diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.*" TEX. CIV. PRAC. & REM.CODE § 74.401(a)(2)(emphasis added). The definitions thus contemplates that the lawsuit will center on a physician's treatment of a patient's illness, injury, or condition, not on the adequacy of a workplace or the training provided to an employee.

**3. The jury instruction mandated by the Legislature contemplates that the claim arises from a health care provider's treatment of a patient.**

In section 74.303(e) of the Act, the Legislature mandated the inclusion of two express jury instructions "[i]n any action on a health care liability claim that is tried by a jury in any court in this state." The second of those is:

A finding of negligence may not be based solely on *evidence of a bad result* to the claimant in question, but *a bad result may be considered* by you, along with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence.

*Id.* § 74.303(e)(2). This instruction reflects the long-recognized principle that a physician who exercises ordinary care, within his school or specialty, is not liable to a patient for a bad outcome. *See Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). Clearly, the instruction only makes sense where a patient or the patient's proxy is dissatisfied by health care services delivered by a health care provider. In the context of the present case, in which the health care provider acted as an employer, the instruction becomes nonsensical.

**B. The Court's Interpretation Is Contrary to Our Prior Interpretations and Attaches Undue Importance to the Alteration of the Definition of "Health Care Liability Claim."**

Noting that "our focus ... is not the status of the claimant," 371 S.W.3d at 178, the Court rejects out of hand Williams's contention that the lack of a patient-physician relationship between him and West Oaks places his suit outside of the Act. It is true, as the Court asserts, that in *Diversicare* we placed great importance upon the essence of the claims, "the alleged wrongful conduct and the duties allegedly breached." 185 S.W.3d at 851. But in

rejecting Rubio's contention that her claim for a sexual assault by another patient should be treated as an ordinary premises liability claim, we attached equal importance to the claimant's status as a patient between the parties: "There is an important distinction in the relationship between premises owners and invitees on one hand and health care facilities and their patients on the other. The latter involves health care." *Id.* at 850. And we emphasized that, were we to agree with Rubio's position, "our decision would have the effect of lowering the standard from professional to ordinary care." *Id.* at 854. The presence of a doctor-patient relationship was undeniably important to our determination that Rubio's allegations amounted to health care liability claims.

The Court attaches much significance to the Legislature's alteration in 2003 of the definition of "health care liability claim." The Act's predecessor, the Medical Liability and Insurance Improvement Act, former article 4590i, defined the term as

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury or death of the *patient*, whether the *patient's* claim or cause of action sounds in tort or contract.

Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(a)(4), 1997 Tex. Gen. Laws 2039,. 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09 2003 Tex. Gen. Laws 847, 884 (emphasis added). In 2003, the Legislature replaced the word "patient" with the term "claimant." TEX. CIV. PRAC. & REM.CODE § 74.001(13). Without regard to the abundant indicia to the contrary throughout the Act, the Court concludes that this change contemplated health care liability claims that do not

arise from the physician-patient relationship.

While claimant is a new term in the definition of health care liability claim, the word was used throughout the TMLIIA before the Legislature made that change. In fact, the Legislature used the term in describing the Act's very purpose: to alleviate a perceived health care crisis "in a manner that will not unduly restrict a *claimant's* rights any more than necessary to deal with the crisis." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(13)(3), 1977 Tex. Gen. Laws 2039, 2040, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 10.09 2003 Tex. Gen. Laws 847, 884 The term was also used and defined in section 13 of article 4590i. That section, the precursor of sections 74.351 and 74.352 of the current act, among other things, required a claimant in a health care liability claim to file an expert report within 180 days. Act of May 1, 1995, 74th Leg., R.S., ch. 971, § 1, sec. 13.01(d), (e), 1995 Tex. Gen. Laws 985, 985–986, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. "Claimant" was defined as

> a party who files a pleading asserting a claim. All plaintiffs claiming to have sustained damages as the result of the bodily injury or death of a single person are considered to be a single claimant.

Act of May 1, 1995, 74th Leg., R.S., ch. 971, § 1, sec. 13.01(d), (e), 1995 Tex. Gen Laws 985, 985–986, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 10.09 2003 Tex. Gen. Laws 847, 884. Accordingly, even though "health care liability claim" referred to injury to or the death of a patient, the statute contemplated that others could pursue claims under article 4590i. And what parties could claim to have damages as the result of the injury or death of a patient but spouses or relatives with their own claims for loss of support or

consortium or mental anguish, or others acting in a representative capacity, such as an estate or next friend? In light of that history, it seems fairly obvious that the Legislature broadened the definition of "health care liability claim" in 2003 to harmonize the definition with its previous recognition that parties other than patients might suffer injuries as the result of a health care provider's departure from accepted standards in rendering health care services to a patient.[1]

## II. Safety Under the Act

Although its holding that Williams has asserted a claim for breach of a health care standard is dispositive, the Court reaches out to decide an issue that isn't even presented: whether a claim for safety under the Act must be directly related to health care. That issue isn't presented because, at least in the Court's view, Williams's claim *is* directly related to health care. West Oaks itself argued that Willams's claims "are inextricably interwoven with the rendition of health care services." Even if the question were properly before us, though, I would reach a different conclusion than the Court. I would hold that a claim for safety under the Health Care Liability Act must arise from a breach of a health care provider's duty to adequately ensure a patient's safety in providing health care services.

The Court's conclusion that a health care liability claim for breach of a safety standard depends entirely on the last antecedent doctrine, 371 S.W.3d at 182, or the notion that " '[m]odifiers should come, if possible, next to the words they modify.' " 371 S.W.3d at 184 (quoting William Strunk, Jr. & E.B. White, THE ELEMENTS OF STYLE R. 20 (4th ed. 2000)). In the Court's view, then, the Legislature would have had to frame the definition as "a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of . . . safety *directly related to health care* or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract. Neither Strunk and White's instructions nor the last antecedent doctrine are so absolute as to require such redundancy. *See City of Dallas v. Stewart*, 361 S.W.3d 562, 571 n. 14 (Tex.2012). Instead, we should read the word in harmony with the other provisions I have discussed, and in conjunction with the words surrounding "safety," which all clearly implicate claims arising from a health care provider's delivery of medical care to a patient. *See City of Boerne*, 111 S.W.3d at 29 (citing *Cty. of Harris v. Eaton*, 573 S.W.2d 177, 179 (Tex. 1978)).

The Court's reading of the term "safety"—"untouched by danger, not exposed to danger; secure from danger, harm or loss"—is so broad that almost any claim against a health care provider can now be deemed a health care liability claim. If a hospital cook leaves an unlit gas burner on and causes an explosion, claims for any resulting injuries might be health care lia-

---

1. The Court also makes much of the Act's definition of "representative," a term used in the Act's medical records disclosure provision. TEX. CIV PRAC. & REM.CODE §§ 74.001(a)(25), .052. "Representative" is defined as the "agent of the patient *or* claimant." The Court concludes this "indicat[es] that patient and claimant do not necessarily refer to the same category of persons." I agree, but my conclusion that "claimant" refers to parties with claims derived from a health care provider's breach of a duty toward a particular patient, such as guardians, executors, survivors, and next friends, is far more consistent with other provisions of the Act than the Court's.

bility claims. If a nurse's deranged spouse arrives at a clinic and shoots her, her claim that the facility provided inadequate security will also fall under the statute. Surely the Legislature did not intend to make professional liability insurers responsible for such claims in order to solve an insurance availability crisis.

### III. The Court's Holding Undermines the Balance Struck by the Legislature in the Workers Compensation Act

I dissent also because, by forcing an employee's negligence suit against his employer for on-the-job injuries into the health-care-liability-claim mold, the Court significantly disrupts the delicate balance between employee and employer interests the Legislature sought to implement when it enacted the Texas Workers Compensation Act (TWCA). The TWCA permits an employee to bring a negligence action against a nonsubscriber like West Oaks. *See* TEX. LAB.CODE § 406.033. By making the common law defenses of assumption of the risk, negligence of a fellow employee, and contributory negligence unavailable to a nonsubscribing employer under the TWCA, *id.* at § 406.033(a), it is clear that the Legislature intended to "penalize[ ] nonsubscribers" and make it easier for their employees to recover. *Kroger Co. v. Keng*, 23 S.W.3d 347, 349, 352 (Tex.2000) (noting that "[t]o encourage employers to obtain workers' compensation insurance, [the TWCA] penalizes nonsubscribers by precluding them from asserting certain common-law defenses in their employees' personal injury actions" and that the "Legislature intended that an employee's fault would neither defeat nor diminish his or her recovery"). Under the Court's holding, employees of nonsubscribing health-care providers will encounter procedural hurdles, such as the Act's notice and expert report requirements, that the TWCA does not contemplate. *See* TEX. CIV. PRAC. & REM.CODE §§ 74.051, 74.351. Failure to comply with these special requirements can result in harsh consequences, including dismissal of a claim with prejudice and assessment of attorneys fees against the plaintiff. *Id.* § 74.351(b). Rather than the health care provider being penalized for not subscribing to workers' compensation insurance, the Court's decision increases the burden and cost of pursuing negligence claims against nonsubscribers for employees of health care institutions. This will likely discourage healthcare workers from bringing smaller claims.

More importantly, the Act places strict limits on damages that may be recovered from health care providers. TEX. CIV. PRAC. & REM CODE §§ 74.301–.303. By conferring the benefit of the Act's statutory damages cap on nonsubscribing health care providers, the Court gives health care provider nonsubscribers a benefit that is at odds with the measures the Legislature implemented to penalize employers who opt not to participate in the workers compensation system. "In enacting section 406.033 and its predecessors, the Legislature intended to delineate explicitly the structure of an employee's personal-injury action against his or her nonsubscribing employer." *Kroger v. Keng*, 23 S.W.3d at 350–351. Today's decision redraws that delineation.

### IV. The Court's Holding Undermines the Legislature's Stated Purposes

In enacting chapter 74, the Legislature found that "the number of health care liability claims [had] increased since 1995 inordinately[,] caus[ing] a serious public problem in availability and affordability of adequate medical professional liability insurance." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(a)(1), (4), 2003 Tex. Gen. Laws 847, 884. It adopted the Act to reduce the frequency and decrease the

costs of those claims. *Id.* at § 10.11(b)(1), (2). By sweeping a whole new class of claims—negligence claims of employees of health care institutions—into chapter 74, the Court *increases* the number of health care liability claims and thwarts that purpose. Mystifyingly, the Court proclaims that its decision is "in harmony" with the Act's purposes because this new class of health care claimants will be required to file expert reports. 371 S.W.3d at 182–83, n. 5. To be sure, Williams's claim will be dismissed in the wake of today's decision—one claim will go away. But, in the future, employees in Williams's position will be forewarned that they must provide an expert report and undoubtedly will do so. The upshot of the Court's decision is that medical professional liability insurers will be responsible for claims that normally would have fallen under a health care employer's workers compensation or comprehensive liability coverage.

The Court has previously declined to construe provisions of the Act in a way that would lead to absurd results. *Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 72–73 (Tex.2011). It should do so here.

### V. Conclusion

The Court's conclusion that Williams's claim against his employer for providing inadequate training and an unsafe workplace is a health care liability claim is not only counterintuitive, it is inconsistent with the Act's express language and its underlying purposes. Furthermore, it alters the contours of employees' claims against non-subscribing health care providers established in the Workers Compensation Act. For these reasons, I respectfully dissent.